IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
IN RE NBR                          )
ANTITRUST LITIGATION               )      Master Docket
_____)      Civil Action No. 03-1898
THIS DOCUMENT RELATES TO:          )
ALL ACTIONS                        )      Judge Cercone
_____)      Magistrate Judge Hay
```

REPORT AND RECOMMENDATION

## I.   RECOMMENDATION

It is respectfully recommended that the Motion to Dismiss submitted on behalf of defendant DSM Copolymer, Inc. (Docket No. 76) be denied.

## II.  REPORT

Plaintiffs commenced this class action suit under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that defendants are manufacturers and sellers of NBR, or acrylonitrile-butadiene rubber, and have engaged in a "global combination or conspiracy to suppress and eliminate competition which had the effect of raising, maintaining, or stabilizing the price of NBR sold in the United States and elsewhere."[1]

Defendant DSM Copolymer, Inc. ("DCI") has presently filed a motion to dismiss arguing that the claims plaintiffs have

---

[1]   Consolidated Amended Class Action Complaint ("the Complaint"), ¶¶ 38, 45 (Docket No. 33).  NBR is apparently a synthetic rubber that is highly resistant to petroleum products, alcohols and heat and is used to manufacture a variety of commercial and industrial products.  Id. at ¶¶ 40, 41.

brought against it are barred by the statute of limitations. Specifically, DCI argues that the applicable limitations period is four years and that because it withdrew from the NBR market in March of 1999, thereby effectively withdrawing from any conspiracy to fix NBR prices, plaintiffs were obligated to bring their claims within four years of that date, or by March of 2003. Because the original complaint was not filed until December 9, 2003, DCI contends it is untimely.

Plaintiffs, of course, disagree, initially arguing that whether a defendant has withdrawn from a conspiracy is a factual issue that should be considered by a jury or on a motion for summary judgment after discovery.  The cases upon which plaintiffs rely, however, do not stand for the cited proposition.

Indeed, in Armco Steel Co. v. CSX Corp, 790 F. Supp. 311 (D.D.C. 1991), rather than decline to address the issue of withdrawal merely because it was raised in a motion to dismiss, the Court thoroughly addressed it noting that "on certain occasions, a Court may find, as a matter of law, that a conspirator withdrew from the conspiracy."  Id. at 322.  Although the Court concluded that the record before it was insufficient to permit a finding that the defendant withdrew from the conspiracy and that any such evidence would nevertheless be outside the pleadings in that case, those findings do not suggest that it is never appropriate for a court to address the issue in a motion to

dismiss or from finding, where the record permits, that the defendant withdrew from the conspiracy.  Id.

Similarly, in United States v. N.A. Waldrop, 786 F. Supp. 1194 (M.D. Pa. 1991), affirmed, 983 F.2d 1054 (3d Cir. 1992), cert. denied, 508 U.S. 950 (1993), upon which plaintiffs also rely, the Court merely held that it could not determine, "as a matter of law, that defendants ... effectuated a withdrawal from the conspiracy from the facts presently before it."  Id. at 1200.  The Court did not find, as plaintiffs have suggested, that the court is precluded from addressing the issue of withdrawal until after discovery has been conducted.

Thus, while it may very well be, at least at this juncture, that there is insufficient evidence of record from which this Court can conclude that DCI withdrew from the conspiracy in March of 1999, the Court is not precluded from addressing the issue merely because the question was presented in a motion to dismiss.  Nor is it precluded from finding that a withdrawal was properly effectuated where supported by the record.  The question remains, however, whether the evidence of record in this case sufficiently supports a finding that DCI withdrew from the alleged NBR price-fixing conspiracy.

Here, DCI contends that it effectively withdrew from any price-fixing conspiracy on March 19, 1999, when it entered into a Raw Material Purchase and Sale Agreement with Zeon

Chemicals L.P. ("Zeon") pursuant to which DCI agreed to sell all

of the NBR it produced to Zeon for a term of ten years commencing

on January 1, 1999.[2]  As well, in a separate Sale and Purchase

Agreement entered into between DCI and Zeon, which became

effective on February 24, 1999, DCI relinquished all rights to

market and sell NBR transferring its NBR client base, product

technology, contracts and good will to Zeon.[3]  Thus, DCI argues

that the statute of limitations began to run in March of 1999,

rendering plaintiffs' claims untimely.[4]

---

[2]     DCI's Brief, pp. 3-4; DCI's Exhibit A: Raw Material Purchase
        and Sale Agreement.

[3]     Id.; DCI's Exhibit B: Sale and Purchase Agreement.  The Raw
        Material Purchase and Sale Agreement and the Sale and
        Purchase Agreement are hereinafter collectively referred to
        as "the Agreements."

[4]     Plaintiffs initially suggest in a footnote that the
        Agreements upon which DCI relies are not properly considered
        by the Court on a motion to dismiss since plaintiffs do not
        refer to them in the complaint and have not otherwise based
        their claims on them.  Although generally courts may
        consider only the allegations set forth in the complaint,
        any exhibits attached thereto and matters of public record
        in resolving a motion to dismiss, "a court may consider an
        undisputedly authentic document that a defendant attaches as
        an exhibit to a motion to dismiss if the plaintiff's claims
        are based on the document...." Pension Benefit Guaranty
        Corp. v. White Consolidated Industries, Inc., 998 F.2d 1192,
        1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042 (1994).
        This exception is premised on the notion that where the
        plaintiff has relied upon certain documents in framing the
        complaint, lack of notice to the plaintiff is no longer a
        concern.  In re Burlington Coat Factory Securities
        Litigation, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here,
        plaintiffs have alleged in the Complaint that "in 1999,
        [DCI] entered into a contractual agreement with defendant
        [Zeon], whereby [Zeon] buys, markets and resells all of the
        NBR produced by [DCI]."  Complaint ¶ 20.  This, in our view,
        not only clearly references the Agreements but alleviates
        any concern regarding notice to plaintiffs.  Moreover,

It appears undisputed that under section 4B of the
Clayton Act, "[a]ny action to enforce any cause of action under
section 15, 15a, or 15c shall be forever barred unless commenced
within four years after the cause of action accrued," and that a
cause of action accrues when a defendant commits an act that
injures a plaintiff's business.  15 U.S.C. § 15b; Zenith Radio
Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).  See
In re Linerboard Antitrust Litigation, 305 F.3d 145, 160 (3d Cir.
2002), cert. denied, 538 U.S. 977 (2003).  Further, in the
context of a continuing conspiracy to violate the antitrust laws,
each time a plaintiff is injured by the act of a defendant, a
cause of action accrues to him to recover damages caused by that
act for which all the co-conspirators are liable.  Zenith Radio
Corp. v. Hazeltine Research, Inc., 401 U.S. at 338; United States
v. Kushner, 305 F.3d 194, 198 (3d Cir. 2002).

It also appears undisputed, however, that where a
defendant has effectively withdrawn from the conspiracy the
statute of limitations against that defendant begins to run on
the date that their involvement was terminated.  United States v.
Antar, 53 F.3d 568, 582 (3d Cir. 1995), abrogated on other
grounds, Smith v. Berg, 247 F.3d 532 (3d Cir. 2001) ("Antar").

_____

    although plaintiffs make much of the fact that they have not
    conceded the authenticity of the Agreements as DCI suggests
    they have, nor have they expressly disputed their
    authenticity.  Under these circumstances, it appears that
    the Agreements are properly considered without converting
    the motion to one for summary judgment.

See <u>United States v. Kushner</u>, 305 F.3d at 198 (Defendant remains

liable for acts of his own and that of co-conspirators in

furtherance of the conspiracy even after withdrawal until the

statute of limitations has run.)

  The defendant bears the initial burden of demonstrating

a prima facie showing of withdrawal. <u>Antar</u>, 53 F.3d at 582. If

successful, the burden shifts to the plaintiff to rebut the

defendant's prima facie showing, which it may do either by

challenging the defendant's prima facie evidence or by presenting

evidence that the defendant engaged in conduct in furtherance of

the conspiracy subsequent to its alleged withdrawal. <u>Id.</u>,

quoting <u>United States v. Local 560 (I.B.T.)</u>, 974 F.2d 315, 338

(3d Cir. 1992).

  Relying on <u>Hyde v. United States</u>, 225 U.S. 347, 369-70

(1912), wherein the United States Supreme Court held that

withdrawal from a conspiracy will be found only where the

defendant does some act "to disavow or defeat the purpose" of the

unlawful scheme, the Court of Appeals for the Third Circuit has

described the defendant's burden as a "rigorous" one, further

finding that:

> "[m]ere cessation of activity in furtherance
> of an illegal conspiracy does not necessarily
> constitute withdrawal." *United States v.*
> *Steele*, 685 F.2d 793, 803 (3d Cir. 1982),
> *cert. denied*, 459 U.S. 908, 103 S. Ct. 213,
> 74 L.Ed.2d 170 (1982). Rather, "[t]he
> defendant must present evidence of some
> affirmative act of withdrawal on his part,

6

> typically either a full confession to the
> authorities or communication to his
> co-conspirators that he has abandoned the
> enterprise and its goals. " *Id.* at 803-04
> (emphasis added); *see also United States v.*
> *Heckman*, 479 F.2d 726, 729 (3d Cir. 1973).

Antar, 53 F.3d at 582.  See United States v. U.S. Gypsum Co., 438

U.S. 422, 464-65 (1978) ("Affirmative acts inconsistent with the

object of the conspiracy and communicated in a manner reasonably

calculated to reach co-conspirators have generally been regarded

as sufficient to establish withdrawal or abandonment.")

The Court then went on to analyze earlier cases in

which it had addressed the issue of withdrawal where a

conspirator had retired or resigned from the conspiring

enterprise and found three principles controlling: 1) that

resignation from the enterprise does not, in and of itself,

constitute withdrawal from a conspiracy; 2) that completely

severing ties with the enterprise may constitute withdrawal from

the conspiracy; unless 3) the defendant continues to do acts in

furtherance of the conspiracy and continues to receive benefits

from the conspiracy's operation.  Antar, 53 F.3d at 583.

Applying these principles in context of the shifting burdens of

proof, the Court ultimately held that:

> if the defendant completely severs his or her
> relationship with the enterprise, he or she
> has established a prima facie showing of
> withdrawal from the conspiracy without
> showing any other affirmative act
> inconsistent with the conspiracy and without
> giving any further notice to his or her

7

> co-conspirators.  Once the defendant makes
> this showing, the burden shifts to the
> [plaintiff] either to rebut the defendant's
> showing or to establish that the defendant
> continued to participate as a co-conspirator.
> However, if the defendant has not completely
> severed his ties with the enterprise, then in
> order to establish a prima facie case, he
> must demonstrate either that he gave notice
> to his co-conspirators that he disavows the
> purpose of the conspiracy or that he did acts
> inconsistent with the object of the
> conspiracy.

Id.  See United States v. Boone, 279 F.3d 163, 192-93 (3d Cir.),

cert. denied, 535 U.S. 1089 (2002) (Finding that defendant "was

required to make a prima facie showing of affirmative acts to

defeat or disavow his membership in the conspiracy.")

     In the instant case, it does not appear that DCI has

completely severed ties with the "enterprise" of manufacturing

and selling NBR.  To the contrary, it appears clear that it has

continued to produce NBR, which it now sells to Zeon pursuant to

the Agreements.  Indeed, DCI has not argued that they have

completely severed ties with the NBR business but, rather,

relying on Matsushita Electric Industrial Co. v. Zenith Radio

Corp., 475 U.S. 574 (1986) ("Matsushita"), argues only that

withdrawal can be found simply because after it entered into the

Agreements it no longer had the incentive or opportunity to fix

prices.  DCI's reliance on Matsushita, however, appears to be

misplaced as the issue in that case was whether there was

sufficient evidence of record from which it could be concluded

that the petitioner participated in a conspiracy in the first instance and not whether, having already joined in the illegal scheme, the defendant did some act to disavow or defeat its purpose as is the case here.  See Antar, 53 F.3d at 369-70. Indeed, the mere fact that DCI no longer had the motivation or opportunity to fix NBR prices does not establish that DCI completely severed ties with the business enterprise, particularly as it concededly continues to manufacture NBR, and does not serve to defeat the conspiracy.

In this manner, Antar, is instructive.  In that case, the defendants were charged with engaging in a RICO conspiracy which defendant Mitchell argued that he had withdrawn from when he resigned from the company.  Although he seemingly no longer had the opportunity or motivation to falsify the company's financial statements at that point, the Court declined to find that he had withdrawn from the conspiracy because he had retained stock in the company and, therefore, had not severed all ties with the enterprise.  Like Mitchell, DCI has not totally severed its ties with the enterprise and, thus, cannot be said to have withdrawn from the conspiracy simply because it no longer had the motivation or opportunity to fix prices.[5]

---

[5]    Conversely, in Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823 (11th Cir. 1999), to which DCI cites, the defendant was found to have withdrawn from the conspiracy to fix milk prices when it sold its dairy.  Because there was no evidence that he had otherwise maintained ties with the dairy business the Court found it completely and permanently

Having failed to establish that it has completely severed ties with the enterprise, DCI must demonstrate either that it gave notice to its co-conspirators that it disavowed the purpose of the conspiracy or did acts inconsistent with the object of the conspiracy in order to make a prima facie showing of withdrawal.  Antar, 53 F.3d at 583.  In our view, merely entering into the Agreements to sell its NBR exclusively to Zeon fails to satisfy this burden.  Rather, the Agreements appear to evidence only that DCI ceased activities in furtherance of the conspiracy, i.e., fixing prices, which is clearly insufficient to establish withdrawal from the conspiracy.  Id. at 582.  See United States v. Patel, 879 F.2d 292, 294 (7th Cir. 1989), cert. denied, 494 U.S. 1016 (1990) ("[H]aving set in motion a criminal scheme, a conspirator will not be permitted by the law to limit his responsibility for its consequences by ceasing, however definitely, to participate.")

It therefore appears that DCI has failed to make a prima facie showing of withdrawal from the conspiracy and, thus, has failed to demonstrate that plaintiffs claims are barred by

---

severed its ties with the enterprise.  Id. at 839.  DCI, on the other hand, has remained in the business of producing and selling NBR and has initially agreed only to sell its product to Zeon through 2009.

the statute of limitations.  As such, DCI's motion is properly denied.[6]

For these reasons, it is recommended that the Motion to Dismiss submitted on behalf of defendant DSM Copolymer, Inc. (Docket No. 76) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


s/Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

Dated:    18 July, 2005

---

[6]     Having found that DCI has failed to establish that it withdrew from the conspiracy in 1999 or that plaintiffs' claims are barred by the statute of limitations, we have not addressed DCI's alternative argument that plaintiffs have not alleged sufficient facts to permit the statute of limitations to be tolled.  Nor have we considered the supplemental authority submitted by DCI in support of its motion and, thus, have not addressed its relevancy or whether properly considered by the Court in the first instance.

11