IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE NBR | ) | |
| ANTITRUST LITIGATION | ) | Master Docket |
| | ) | Civil Action No. 03-1898 |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | Judge Cercone |
| | ) | Magistrate Judge Hay |

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

It is respectfully recommended that the motion to dismiss ParaTec's cross-claims (Docket No. 104-1) submitted on behalf of defendants Crompton Corporation and Uniroyal Chemical Company, Inc. be granted as to Counts IV, V, VI and VII and denied in all other respects, and that the motion to compel arbitration (Docket No. 104-2) be denied.

II.  REPORT

Plaintiffs commenced this class action suit under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that defendants are manufacturers and sellers of NBR, or acrylonitrile-butadiene rubber, and have engaged in a "global combination or conspiracy to suppress and eliminate competition which had the effect of raising, maintaining, or stabilizing the price of NBR sold in the United States and elsewhere."[1]

---

[1]    Consolidated Amended Class Action Complaint ("the Complaint"), ¶¶ 38, 45 (Docket No. 33).  NBR is apparently a synthetic rubber that is highly resistant to petroleum

Defendant ParaTec Elastomers LLC ("ParaTec") filed cross-claims against defendants Crompton Corporation ("Crompton") and Uniroyal Chemical Company, Inc. ("Uniroyal"), alleging that it is entitled to indemnification from Crompton with respect to plaintiffs' claims and that Crompton and Uniroyal have breached their contractual duties owed to ParaTec.

According to ParaTec's cross-claims, ParaTec was created in September of 1998 as the result of a joint venture between Uniroyal, which was subsequently subsumed by Crompton,[2] and GIRSA S.A. de C.V., a predecessor of defendant DESC S.A. de C.V. ("DESC").[3]  ParaTec's function was to market certain NBR products produced by a related manufacturing company that was also created by the joint venture.[4]  ParaTec alleges that the marketing activities for these NBR products had previously been performed by employees of Crompton and that when ParaTec began operations it continued to provide the same services using the same offices and employees that Crompton had used.[5]  Thus,

---

[  ] products, alcohols and heat and is used to manufacture a variety of commercial and industrial products.  Id. at ¶¶ 40, 41.

[2]  Accordingly, we have hereinafter referred to Crompton and Uniroyal collectively as "Crompton."

[3]  Cross-claims of ParaTec ¶ 7 (Docket No. 50).  See Defendants' Exhibit 1: Joint Venture Agreement ("JVA") (Docket No. 107).

[4]  Id.

[5]  Id. ¶ 8.

according to ParaTec, although it was functioning as a new corporate entity, Crompton's employees were still providing the marketing services but were doing so for ParaTec's benefit.[6]

This arrangement was apparently governed by two agreements, a Sales Service Agreement and a Corporate Service Agreement, which purportedly allowed Crompton to control and manage ParaTec's marketing services and daily operations which, in turn, allowed it to play a critical role in determining the prices for ParaTec's NBR products.[7]   The Sales Service Agreement contained a provision in which Crompton agreed to carry out its services in accordance with accepted industry standards and both agreements provided that the parties would be liable to one another for breaches of the agreement brought about by gross negligence or willful misconduct.[8]

In December of 2001, Crompton apparently sold its interest in ParaTec to a subsidiary of DESC.  According to ParaTec's cross-claims, the transaction was governed by two other agreements: the Share Purchase Agreement, pursuant to which Crompton was to continue to operate ParaTec in an appropriate and legal manner through payment of the selling price, and the

---

[6]    Id. ¶ 9.

[7]    Id. ¶¶ 9-11, 13.  See Defendants' Exhibits 3 and 4: Sales Service Agreement and Corporate Service Agreement, respectively.

[8]    Id. ¶¶ 12, 14.

3

Transition Services Agreement, which provided for a transition period even after payment had been made whereby Crompton was to continue to provide certain services for at least one year after receiving payment for its share of ParaTec.[9]  The Transition Service Agreement also provided that Crompton could be held liable for losses caused by its gross negligence or willful misconduct.[10]

A fifth agreement, ParaTec's Limited Liability Company Agreement (the "LLC Agreement"), which was executed in September of 1998, also governed ParaTec's operations and the parties' relationships and respective obligations.[11]  The LLC Agreement contains an indemnification provision pursuant to which, according to ParaTec, Crompton agreed to indemnify ParaTec for any losses or liabilities it incurs as the result of Crompton's improper conduct, including breaches of representations and covenants in the LLC Agreement and the other agreements referenced above.[12]

ParaTec alleges that, because its operations were controlled and conducted by Crompton, any involvement in an

---

[9]   Id. ¶¶ 15, 16.  See Defendants as Exhibits 5 and 6: Share Purchases Agreement and Transition Services Agreement, respectively.

[10]   Id. ¶ 16.

[11]   Id. ¶ 17.  See Defendants Exhibit 2: LLC Agreement.

[12]   Id. ¶¶ 20-22.  The various agreements outlined above are hereinafter referred to collectively as "the Agreements."

unlawful conspiracy as alleged by plaintiffs, is necessarily attributable to Crompton and its employees and that, if Crompton, in fact, operated ParaTec in a manner violative of federal antitrust laws, then Crompton has also breached its obligations, representations and covenants in the Agreements thereby entitling ParaTec to indemnification under the LLC Agreement.[13]

ParaTec also claims that, to avoid facing criminal liability for violating the antitrust laws, it subsequently entered into an oral agreement with Crompton whereby it would provide Crompton with records and information which Crompton was to disclose to the appropriate authorities in an effort to obtain immunity for both parties.[14]  Although Crompton successfully obtained immunity for itself and ParaTec from the United States regulatory authority, Crompton only sought and obtained immunity for itself in the European Union which was not only detrimental to ParaTec but in violation of their agreement.[15]

ParaTec filed its cross-claims on June 22, 2004, bringing claims against both Crompton and Uniroyal for contractual indemnification pursuant to the LLC Agreement (Count

---

[13]   Id. ¶¶ 23, 24.

[14]   Id. ¶ 27.

[15]   Id. ¶¶ 27-30.  ParaTec has also alleged that Crompton violated their agreement by failing to obtain immunity for ParaTec from the Canadian authorities as well.  ParaTec, however, was able to obtain immunity in Canada for itself, an option which, according to ParaTec, is no longer available in the European Union.  Id. ¶¶ 28, 30.

I); breach of fiduciary duty for failing to operate ParaTec in a lawful manner (Count II); breach of covenant of good faith and fair dealing for refusing to indemnify ParaTec under the LLC Agreement (Count III); and violation of the Connecticut Unfair Trade Practices Act, Gen. Stat. §§ 42-110a, et seq. (Count IV). ParaTec has also brought claims against Crompton alone for breach of contract (Count V), fraud (Count VI), and promissory estoppel (Count VII) which revolve around the alleged oral agreement regarding immunity.

Crompton has now filed a motion to dismiss ParaTec's cross-claims arguing that ParaTec's first and third claims are properly dismissed as it has no right to indemnification for violations of the Sherman and Clayton Acts and that ParaTec's remaining claims are improper under Rule 13(g) and for want of subject matter jurisdiction. Defendants alternatively ask, in the event that any of ParaTec's claims survive the motion to dismiss, that the Court compel arbitration of those claims pursuant to "the parties' multiple binding arbitration agreements" and the Federal Arbitration Act, 9 U.S.C. § 1, et seq ("FAA").

Where a motion to compel arbitration has been filed, however, the court may only consider issues relating to the agreement to arbitrate. <u>Prima Paint Corp. v. Flood & Conklin Manufacturing Co.</u>, 388 U.S. 395, 404 (1967); <u>Great Western Mortg.</u>

Corp. v. Peacock, 110 F.3d 222, 228 (3d Cir.), cert. denied, 522
U.S. 915 (1997).  If a valid arbitration agreement is found to
exist, any issues revolving around the complaint are properly
decided by the arbitrator.  Id.  See AT&T Technologies, Inc. v.
Communications Workers of America, 475 U.S. 643, 649-50 (1986);
Labib v. Younan, 755 F. Supp. 125, 127 (D.N.J. 1991)("It is the
duty of the court only to determine whether a dispute is
arbitrable, and not to consider the merits of the action.")  See
also Merit Insurance Co. v. Leatherby Insurance Co., 581 F.2d
137, 142 (7th Cir. 1978)("If the agreement to arbitrate is valid
the court has no further power or discretion to address the
issues raised in the complaint but must order arbitration.")
Thus, it appears that the Court is compelled to address
Crompton's arbitration issue first since, if the parties agreed
to arbitrate their disputes, the other issues raised by Crompton
are properly decided by an arbitrator and not by the Court.

       The FAA, which was enacted "to reverse the longstanding
judicial hostility to arbitration agreements ... and to place
arbitration agreements upon the same footing as other contracts,"
Green Tree Financial Corp. v. Randolph, 531 U.S. 79, 89 (2000),
quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24
(1991), provides that:

            A written provision in a contract evidencing
            a transaction involving commerce to settle by
            arbitration a controversy thereafter arising
            out of such contract ... shall be valid,

7

> irrevocable, and enforceable, save upon such
> grounds as exist under law or in equity for
> the revocation of any contract.

9 U.S.C. § 2.  Thus, where a contract involves "commerce," the
FAA applies and federal law governs all questions revolving
around the construction, validity and enforcement of an
arbitration clause.  Medtronic AVE, Inc. v. Advanced
Cardiovascular Systems, Inc., 247 F.3d 44, 54 (3d Cir. 2001).
See Becker Autoradio U.S.A. v. Becker Autoradiowerk GmbH, 585
F.2d 39, 43 (1978), quoting Coenen v. R. W. Pressprich & Co., 453
F.2d 1209, 1211 (2d Cir.), cert. denied, 406 U.S. 949 (1972)
("Once a dispute is covered by the [FAA], federal law applies to
all questions of interpretation, construction, validity,
revocability, and enforceability" of the arbitration clause.)[16]

Here, it appears undisputed that the Agreements at
issue involve "commerce" and that the FAA applies.  Thus, the
only issue before the Court is whether the instant dispute falls
within the scope of an arbitration agreement.  Medtronic Ave,
Inc. v. Advanced Cardiovascular Systems, Inc., 247 F.3d at 54.
In order to make that determination, the Court of Appeals for the
Third Circuit has cautioned that there is a presumption of

---

[16]     Although there appears to be some case law suggesting that
state law governs whether the parties entered into a valid
agreement to arbitrate in the first instance, the validity
of the various Agreements and arbitration clauses involved
in this case do not appear to be in dispute.  See First
Options of Chi. Inc. v. Kaplan, 514 U.S. 938, 944 (1995);
Spinetti v. Service Corporation International, 324 F.3d 212,
219 (3d Cir. 2003); Willow Valley Manor v. Trouvailles,
Inc., 977 F. Supp. 700, 702 (E.D. Pa. 1997).

arbitrability and that "[a]n order to arbitrate 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Id. at 55, quoting United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960).  The Court also recognized, however, that there is a limit in resolving disputes in favor of arbitration reiterating that "while interpretive disputes should be resolved in favor of arbitrability, 'a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." Id., quoting PaineWebber Inc. v. Hartmann, 921 F.2d 507, 513 (3d Cir. 1990), overruled by implication on other grounds, Howsam v. Dean Witter Reynolds, 537 U.S. 79, 85 (2002).

        In the instant case, ParaTec contends that the only written agreement pursuant to which it has asserted a claim is the LLC Agreement and that because the LLC Agreement does not contain an arbitration clause the instant dispute is not within the scope of an arbitration agreement and its claims are properly litigated.  Crompton, on the other hand, argues that ParaTec's claims are subject to arbitration because they are premised on and, indeed, reference the various Agreements governing the joint venture all of which contain or incorporate by reference arbitration provisions.  Specifically, Crompton points out that

the JVA, the Share Purchase Agreement and the Transition Service Agreement all contain broad arbitration clauses providing for arbitration of disputes "arising out of or relating to this Agreement," and that the Sales Service Agreement and the Corporate Service Agreement incorporate the arbitration provision in the JVA.  With respect to the LLC Agreement, although Crompton acknowledges that it does not contain an arbitration provision, it notes that it was entered into "subject to the terms of the Joint Venture Agreement," which Crompton argues suggests that the arbitration clause contained in the JVA applies.  Because ParaTec's claims are premised on alleged breaches of these various agreements, Crompton argues that they "touch matters" covered by the agreements and, thus, are covered by the arbitration clauses contained therein.

        To support its position, Crompton relies primarily on Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985) ("Mitsubishi").  In Mitsubishi, the parties entered into a Sales Agreement which provided for the direct sales of Mitsubishi products to defendant Solar, an automobile dealer which had a distributorship for the sale of Mitsubishi-manufactured vehicles within a designated geographical area in Puerto Rico.  The Sales Agreement contained an arbitration clause, entitled "Arbitration of Certain Matters," which provided that "[a]ll disputes, controversies or differences which may

arise between [Mitsubishi] and [Solar] out of or in relation to Articles I-B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration ...."  After Solar's business began to wane, it attempted to delay or cancel shipment of several orders and to arrange for the "transshipment of a quantity of its vehicles for sale in the continental United States and Latin America," which Mitsubishi refused to permit. Although Mitsubishi eventually withheld shipment of 966 vehicles, it also brought suit alleging that Solar had breached the Sales Agreement and sought an order compelling arbitration as provided for therein.  Solar counterclaimed also bringing claims against Mitsubishi for breach of the Sales Agreement as well as claims for defamation and violations of the Sherman Act and several Puerto Rico statutes.

Although the United States Supreme Court granted certiorari primarily to consider whether an American court could enforce an arbitration agreement encompassing antitrust claims when the agreement arises from an international transaction, the Court initially addressed Solar's contention that a court may not construe an arbitration agreement to encompass statutory claims where the statute at issue is designed to protect a class to which the party arguing against arbitration belongs unless that party has expressly agreed to arbitrate those claims.  Id. at 624-25.  In so arguing, Solar suggested that because the

11

arbitration clause at issue in that case called for arbitration
of only "certain matters" and referred only to Articles I-B
through V of the Sales Agreement, that it should be read narrowly
to the exclusion of any statutory claims.

The Court, however, rejected Solar's position noting
that included within the "certain matters" to be arbitrated was
"[a]ll disputes, controversies or differences which may arise
between [the parties] out of or in relation to [the specified
provisions] or for the breach thereof."  The Court found that the
exclusion of some issues from the scope of arbitration did not
restrict the reach of an otherwise broad clause and concluded
that "insofar as the allegations underlying the statutory claims
'touch matters' covered by the enumerated articles, the Court of
Appeals properly resolved any doubt in favor of arbitrability."
Id. at 625 n.13. Crompton asserts that other Courts have read
this quoted language very expansively, applying it to "any cause
of action," and argues that because ParaTec's claims "touch
matters" covered by the arbitration clauses contained in the
various Agreements, arbitration should be compelled here.

ParaTec does not dispute that its claim for contractual
indemnification under the LLC agreement "touches" the other
agreements since breaches of the other agreements provides a
basis for indemnification under the LLC Agreement, but contends
that the relationship between the Agreements and the parties

12

thereto differs from that in <u>Mitsubishi</u>, and that <u>Mitsubishi</u> is therefore not controlling.

Specifically, ParaTec notes that in <u>Mitsubishi</u>, there was only one agreement at issue to which both litigants were signatories.  Thus, the only question was whether the arbitration clause contained in that agreement covered the plaintiff's claims.  In contrast, ParaTec argues, not only is an arbitration clause noticeably absent from the agreement pursuant to which its claims are brought but that it is not a signatory to the JVA which contains the clause under which Crompton seeks to compel arbitration.[17]  Under these circumstances, ParaTec argues, <u>Industrial Electronics Corp. v. iPower Distribution Group, Inc.</u>, 215 F.3d 677 (7th Cir. 2000) ("<u>Industrial Electronics</u>"), should control.

In <u>Industrial Electronics</u>, eight industrial supply dealers, including the plaintiff, formed a limited liability corporation ("LLC") which, in turn, entered into a franchise agreement with the defendant.  The franchise agreement, which permitted the LLC to purchase the defendant's software designed to allow customers to buy products from multiple dealers in a single order, contained an arbitration clause.  Two years later,

---

[17]   Although Crompton points out the fact that ParaTec is not a signatory to the LLC Agreement either, it does not dispute, nor can it, that the terms of the LLC Agreement provide ParaTec with the right of indemnification.  <u>See</u> Defendants' Exhibit 2: LLC Agreement, § 7.5.

the plaintiff filed a lawsuit alleging that the defendant had made material misrepresentations about its software to induce the plaintiff to join the LLC.  The defendant sought a stay pending arbitration which the district court denied.  On appeal, the Court of Appeals for the Seventh Circuit affirmed finding that the injuries claimed by the plaintiff did not arise out of or relate to the franchise agreement but rather revolved around its inducement to investment in the LLC and that the agreement pursuant to which the LLC was formed did not contain an arbitration provision.  In so finding, the Court held that "[a] dispute that arises under one agreement may be litigated notwithstanding a mandatory arbitration clause in a second agreement, even where the agreements are closely intertwined." Id. at 680.

        ParaTec likens the corporate structure involved in Industrial Electronics to that of the joint venture in this case arguing that just as the LLC in Industrial Electronics was formed for the purpose of entering into a franchise agreement, ParaTec was formed for the purpose of entering into certain of the related Agreements and furthering the activities of the joint venture.  Further, like the plaintiff in Industrial Electronics, ParaTec notes it has not raised a claim under the JVA but is asserting a right under the LLC Agreement which contains no arbitration clause.  Thus, even though the agreements may be

14

closely intertwined, ParaTec argues it is asserting a right that exists independently of the JVA and the arbitration clause contained therein does not apply.

Similarly, in E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates S.A.S., 269 F.3d 187 (3d Cir. 2001), upon which ParaTec also relies, a joint venture agreement was entered into by DCP, a subsidiary of DuPont, Rhodia Fiber and LYPFC which contained an arbitration clause. After the joint venture failed, DuPont brought suit against Rhodia Fiber and its parent company for breach, not of the Joint Venture Agreement, but of an oral agreement made several years later between DuPont and the two defendants pursuant to which the defendants agreed to support the joint venture. The defendants moved to compel arbitration under the Joint Venture Agreement to which DuPont was not a signatory. The Court of Appeals for the Third Circuit found that a non-signatory such as DuPont could not be bound by an arbitration clause unless found to be "akin to a signatory" under traditional principles of contract and agency law such as being a third-party beneficiary of the agreement, acting as an agent or under a theory of equitable estoppel, none of which were applicable. Id. at 194-202. In addressing the latter, although the Court opined that there may be instances where a non-signatory can be bound by an arbitration clause where the claims at issue were intertwined with the underlying

contractual obligations, it concluded that the oral contract at issue was "far enough removed from the Agreement" such that DuPont should not be bound by the arbitration provision even though the oral agreement merely bound Rhodia Fiber to the very obligations it undertook in the Joint Venture Agreement.  <u>Id.</u> at 200-02.

Finally, ParaTec relies on <u>Bouriez v. Carnegie Mellon University</u>, 359 F.3d 292 (3d Cir. 2004), in which Carnegie Mellon and Zeta Projects entered into an agreement ("the Funding Agreement") pursuant to which Zeta Projects would fund certain research projects undertaken at the University.  Governors Refining Technologies, a partially owned subsidiary of Governors Technologies Corp., subsequently assumed Zeta Projects' position in the Funding Agreement.  Several years later, Carnegie Mellon solicited support for a particular project from the plaintiff who, having agreed to provide such support, became a shareholder of Governors Technology.  The project subsequently underwent an audit which, according to the plaintiff, revealed that Carnegie Mellon had misrepresented the status of the project to induce him to fund the project by investing in Governors Technology.  The plaintiff brought suit and Carnegie Mellon sought to compel arbitration based on the arbitration clause contained in the Funding Agreement which neither the plaintiff nor Governors Technologies had signed.  Noting, too, that traditional common

16

law theories such as third party beneficiary, agency and
equitable estoppel can bind a non-signatory to an arbitration
clause, the Court found no evidence of an agency relationship or
that the plaintiff benefitted directly from the Funding Agreement
as Carnegie Mellon had argued.  Relying on <u>Industrial
Electronics</u>, the Court specifically found that because the
plaintiff's claims revolved around the shareholder agreement he
entered into with Governors Technology and not the Funding
Agreement that the plaintiff could not be estopped from avoiding
the arbitration clause.

        These cases, in our view, appear more analogous to the
circumstances presented in the instant case than those set forth
in <u>Mitsubishi</u>.  Indeed, it is clear that a party may only be
compelled to arbitrate "where that party has entered into a
written agreement to arbitrate that covers the dispute." <u>E.I.
DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin
Intermediates S.A.S.</u>, 269 F.3d at 194, quoting <u>Bel-Ray Co. v.
Chemrite (Pty) Ltd.</u>, 181 F.3d 435, 444 (3d Cir. 1999).  Here, it
does not appear that ParaTec entered into a written agreement to
arbitrate that covers the instant dispute.  Not only is ParaTec
not a signatory to the agreement to arbitrate contained in the
JVA but the dispute at issue here is whether ParaTec is entitled
to indemnification under the LLC Agreement.  <u>See</u> <u>Dayhoff Inc. v.
H.J. Heinz Co.</u>, 86 F.3d 1287, 1296 (3d Cir.), <u>cert.</u> <u>denied</u>, 519

U.S. 1028 (1996)(Finding that the arbitration clause in the
agreement at issue could only be enforced against the signatories
to that agreement.)  The LLC Agreement, however, does not contain
an arbitration clause and, thus, it does not appear that
ParaTec's claim falls within the scope of an agreement to
arbitrate.  See Medtronic Ave, Inc. v. Advanced Cardiovascular
Systems, Inc., 247 F.3d at 55 (In determining the scope of an
arbitration clause the court's inquiry is limited to ascertaining
whether the party seeking arbitration is making a claim which on
its face is governed by the contract.)  Thus, although it is
undisputed that the Agreements and their various signatories are
related, it does not appear that under the circumstances of this
case that fact serves to compel ParaTec to arbitrate a dispute
that it did not agree to arbitrate.[18]

        Moreover, viewing the Agreements as a whole only lends
support to a finding that the parties did not intend for
indemnification claims brought under the LLC Agreement to be
arbitrated.  As ParaTec points out, not only is the LLC Agreement
the only agreement that does not contain an arbitration clause

---

[18]    Nor do the other cases cited by Crompton compel a different
        result as in those cases, like in Mitsubishi, both parties
        were signatories to the agreements involved in the dispute.
        See Brayman Constr. Corp. v. Home Insurance Co., 319 F.3d
        622 (3d Cir. 2003); WorldCrisa Corp. v. Armstrong, 129 F.3d
        71 (2d Cir. 1997); Genesco, Inc. v. Kakiuchi & Co., 815 F.2d
        840, 846 (2d Cir. 1987); Weatherly Cellaphonics Partners v.
        Hueber, 726 F. Supp. 319 (D.D.C. 1989); Hannah Furniture Co.
        v. Workbench, Inc., 561 F. Supp. 1243 (W.D. Pa. 1983); and
        In re Managed Care Litigation, 2003 U.S. Dist. LEXIS 23035
        (S.D. Fla. September 15, 2003).

but under its terms ParaTec clearly has a right to litigate a
claim for indemnification against Crompton.  Further, as ParaTec
contends, it appears clear from the fact that all the other
Agreements at issue contain an arbitration clause that the
parties were capable of including one in the LLC Agreement if it
was their intent to have claims for indemnification arbitrated.
The fact that they chose not to include an arbitration clause in
the LLC Agreement suggests that the parties deliberately
structured the various agreements surrounding the joint venture
so that claims for indemnification arising when a third-party
commences an action against ParaTec or another member may be
litigated in the same forum as the underlying suit.  Under these
circumstances, it appears that ParaTec should not be compelled to
arbitrate its claims brought pursuant to the LLC Agreement.[19]

        We therefore turn to the other issues raised in
Crompton's motion to dismiss concerning whether ParaTec has a
right to indemnification under the Sherman and Clayton Acts and

---

[19]    Although Crompton suggests that its argument regarding
        arbitration is equally applicable to ParaTec's fourth cause
        of action brought under the Connecticut Unfair Trade
        Practices Act, Count IV, like Counts V, VI and VII, appears
        to revolve around the alleged oral contract entered into
        between ParaTec and Crompton pursuant to which ParaTec
        alleges it provided documents to Crompton for the purpose of
        obtaining immunity for both parties in various
        jurisdictions.  It therefore appears that none of the
        Agreements discussed above is implicated which would
        seemingly preclude a finding that Count IV falls within the
        scope of their arbitration clauses either.

whether ParaTec's other claims are permissible cross-claims under Rule 13(g) and 28 U.S.C. § 1367.

In reviewing a motion to dismiss under Rule 12(b)(6), all well pleaded allegations of the complaint must be accepted as true and viewed in a light most favorable to the non-movant. Brader v. Allegheny General Hospital, 64 F.3d 869, 873 (3d Cir. 1995); Scrob v. Patterson, 948 F.2d 1402, 1405 (3d Cir. 1991). The Court is not, however, required to accept as true unsupported conclusions and unwarranted inferences. Schuylkill Energy Resources v. PP&L, 113 F.3d 405, 417 (3d Cir. 1997). Thus, "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the motion to dismiss is properly granted. Haines v. Kerner, 404 U.S. 519, 520-21 (1972), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The issue is not whether the plaintiff will prevail in the end but only whether he should be entitled to offer evidence in support of his claim. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

Crompton initially argues that ParaTec's claims for indemnification brought at Counts I and III should be dismissed because ParaTec has no right to indemnification for violations of the antitrust laws. Specifically, Crompton contends that ParaTec can only be required to pay damages to plaintiffs if ParaTec is found liable for knowingly participating in the illegal NBR

conspiracy and that, because indemnification is not available to a party who violates the antitrust laws, ParaTec is precluded from seeking it here.

Crompton, however, has cited no cases which have held that a claim for indemnification brought pursuant to a contractual provision cannot be enforced in an antitrust case. Rather, Crompton relies on Professional Beauty Supply, Inc. v. National Beauty Supply, Inc., 594 F.2d 1179 (8th Cir. 1979), in which the Court of Appeals for the Eighth Circuit merely held that no right to indemnification exists at common law, and Texas Industries v. Radcliff Materials, Inc., 451 U.S. 630 (1981), in which it was found that no common law right to contribution exists in an antitrust case.[20]  To the extent that Crompton has cited cases where, like here, contractual indemnification was at issue, they were largely decided under the federal securities laws and the Racketeer Influenced and Corrupt Organization Act ("RICO") which, unlike in antitrust cases, recognize a right to contribution amongst tortfeasors.  See Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir.), cert. denied, 397 U.S. 913 (1970)(securities case); Sikes v. AT&T, 841 F. Supp. 1572

---

[20]    The Eighth Circuit also held that, unlike indemnification, a common law right to contribution may be available in an antitrust case.  Professional Beauty Supply, 594 F.2d at 1186.  Although that holding was subsequently abrogated by the United States Supreme Court in Texas Industries v. Radcliff Materials, Inc., 451 U.S. 630 (1981), the Supreme Court left the holding in Professional Beauty Supply regarding common law indemnification undisturbed.

(S.D. Ga. 1993)(RICO case); <u>Alvarado Partners, L.P. v. Mehta</u>, 723
F. Supp. 540 (D. Colo. 1989)(securities case); <u>McLean v.
Alexander</u>, 449 F. Supp. 1251 (1978)(securities case); <u>Kennedy v.
Josephthal & Co.</u>, 1983 WL 1314 (D. Mass. May 9, 1983)(securities
case).

　　　　Indeed, only two cases relied upon by Crompton involve
claims for contractual indemnification in an antitrust context.
<u>See</u> <u>MacMillan Bloedel Ltd. v. Flintkote Co.</u>, 760 F.2d 580 (5th
Cir. 1985)("<u>MacMillan</u>"); <u>Manildra Milling Corp. v. Ogilvie Mills,
Inc.</u>, 1988 U.S. Dist. LEXIS 7705 (D. Kan. June 13,
1988)("<u>Manildra</u>").  In <u>MacMillan</u>, however, the Court did not hold
that the indemnity clause was unenforceable merely because it was
being invoked in an antitrust case as it found with respect to
the plaintiff's claim for contribution.  Indeed, the Court
specifically declined "to define the policy of the antitrust laws
or to decide whether that policy would invalidate some or all
indemnity agreements ...."  <u>Id.</u> at 584.  Rather, the Court held
that the monies the plaintiff sought to recoup were not covered
by the indemnification provision at issue since they were paid to
settle the antitrust claims relating to plaintiff's own potential
liability and not that of the company it purchased during the
alleged conspiracy.  <u>Id.</u> at 585.

　　　　Similarly, the Court in <u>Manildra</u> held that defendant
Ogilvie was unable to receive indemnification from the third-

party defendant Henkel because the agreement at issue provided only that Henkel would indemnify Ogilvie for liabilities arising out of Henkel's actions and none of the allegations contained in the plaintiff's complaint related to Henkel's activities.  Id. at *7-8.  It did not hold, as Crompton has suggested, that there is no right to contractual indemnification in an antitrust case.[21]

Although we recognize that the plaintiffs in the instant case have alleged ParaTec's participation in the antitrust conspiracy as well as Crompton's, ParaTec's cross-claims are premised on the notion that even though it was a separate entity it was controlled and operated by Crompton during the class period and, thus, any wrong doing for which it may be found liable is, in fact, attributable to Crompton.[22]  If, in fact, ParaTec is able to prove that it was an unknowing player,

---

[21]     Crompton also cites to UCAR International Inc. v. Union Carbide Corporation, 2004 WL 137073 (S.D.N.Y. January 26, 2004), for the proposition that the public policies underlying the prohibition of common law contribution or indemnification in antitrust cases is equally applicable to cases where indemnification is sought pursuant to a contractual provision.  In UCAR, however, the plaintiff was not seeking to invoke the indemnification provision in the agreement at issue.  Indeed, under the indemnification provision, UCAR was the indemnitor, not the indemnitee, and for that reason was seeking to have the indemnification provision declared void and unenforceable.  Id. at *1. Thus, to the extent that the Court found that UCAR's suit, which purportedly was brought to recoup monies paid as part of a "leverage recapitalization," was in fact an attempt to seek indemnification for the fines UCAR paid after pleading guilty to a price fixing conspiracy, it appears to have done so based on common law and not the indemnification provision.  Id. at *8.

[22]     See Cross-Claims ¶¶ 25, 26, 31-35.

enforcing the indemnification provision in this case would not appear to run afoul of either public policy or state law which prohibits an intentional wrongdoer from claiming indemnity for its own illegal activities.  Thus, it does not appear that ParaTec can prove no set of facts in support of its indemnification claims and Crompton's motion in this regard is properly denied.  See Fireman's Fund Insurance Co. v. Western National Mutual Group, 851 F. Supp. 1361, 1366-67 (D. Minn. 1994)(Finding that the defendants had failed to show that the indemnification provision in the agreement could not be legally applied in an antitrust case opining that, although Texas Industries held that "no statutory or common law right of contribution exists, it did not hold that such a right would violate the antitrust laws.")

Finally, Crompton argues that ParaTec's claims brought at Counts IV, V, VI and VII, which revolve around the alleged oral agreement between the parties regarding immunity, should be dismissed because under Federal Rule of Civil Procedure 13(g) they are not proper cross-claims and because the Court nevertheless lacks jurisdiction to hear them.  Specifically, Crompton contends that under Rule 13(g), any cross-claim by one party against a co-party must arise out of "the transaction or occurrence" that is the subject matter of the original action and that because ParaTec's claims regarding an alleged oral agreement

24

to seek immunity are unrelated to the underlying price fixing conspiracy, they are impermissible.[23]

As argued by ParaTec, however, Crompton's argument appears to overlook Rule 18(a), which provides that: "A party asserting a claim to relief as [a] ... cross-claim ... may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as the party has against an opposing party." See MGD Graphic Systems, Inc. v. A&A Bindery, Inc., 76 F.R.D. 66, 67-68 (E.D. Pa. 1977) ("As [Rule 18(a)] expressly states, a party asserting a claim for relief against an opposing party has the right to join with that claim any and all claims which he has against the opposing party in a single complaint.")  Having brought claims for indemnification, which are clearly proper under Rule 13(g), it appears that ParaTec's other claims are properly joined pursuant to Rule 18(a).

Indeed, Crompton appears to concede as much acknowledging in its reply brief that its argument was premised on the assumption that ParaTec's cross-claims for indemnification would be dismissed and, thus, the remaining counts, standing alone, would have to satisfy the "same transaction and

---

[23]    Rule 13(g) provides that: "A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

25

occurrence" test of Rule 13(g).  Having declined to dismiss
ParaTec's claims for indemnification, however, it appears that
its claims brought at Counts IV, V, VI and VII revolving around
the alleged oral agreement between the parties are properly
brought under Rule 18(a).

The question remains, however, whether the Court may
properly invoke supplemental jurisdiction over ParaTec's last
four cross-claims under 28 U.S.C. § 1367.  See Fed. R. Civ. P.
82.

Section 1367 provides that:

in any civil action in which the courts have
original jurisdiction, the district courts
shall have supplemental jurisdiction over all
other claims that are so related to claims in
the action within such original jurisdiction
that they form part of the same case or
controversy under Article III of the United
States Constitution.

28 U.S.C. § 1367(a).  It appears undisputed that in order to meet
this standard, three requirements must be met: (1) the federal
claims must have substance sufficient to confer subject matter
jurisdiction; (2) the state and federal claims must derive from a
common nucleus of operative fact; and (3) the plaintiff's claims
must be such that he would ordinarily be expected to try them all
in one judicial proceeding.  In re Prudential Insurance Co. of
America Sales Practices Litigation, 148 F.3d 283, 302 (3d Cir.
1998), cert. denied, 525 U.S. 1114 (1999), quoting United Mine
Workers v. Gibbs, 383 U.S. 715, 725 (1966).  Further, the Court

26

of Appeals for the Third Circuit has found that although "mere tangential overlap of facts is insufficient ... total congruity between the operative facts of the two cases is unnecessary." Nanavati v. Burdette Tomlin Memorial Hospital, 857 F.2d 96, 105 (3d Cir. 1988), cert. denied, 489 U.S. 1078 (1989).

Here, it is undisputed that the Court has jurisdiction over plaintiff's antitrust claims thereby satisfying the first requirement.  At issue then is whether ParaTec's claims revolving around the alleged oral agreement with Crompton regarding immunity are derived from a common nucleus of operative fact and whether one would expect them to be tried in one judicial proceeding.

Crompton argues that there is no common nucleus of operative facts between plaintiff's antitrust claims and ParaTec's claims revolving around the oral immunity agreement. More specifically, Crompton contends that the none of the facts necessary to prove the existence of an enforceable contract to obtain immunity or how it was breached bears any relationship to the plaintiff's claims that defendants engaged in a price-fixing conspiracy.

ParaTec responds arguing that the alleged existence of the price-fixing conspiracy is "critical background" to its claims revolving around the oral agreement and, indeed, is what prompted the parties to agree to approach the authorities in the

first instance.  As such, ParaTec concludes that its state law contract claims arise out of the same facts as plaintiffs' antitrust claims thereby satisfying the requisite standard for supplemental jurisdiction.

Although we agree with ParaTec that absent the antitrust litigation there would have been no need to seek immunity or enter into the alleged agreement with Crompton, the mere fact that the antitrust suit provides the impetus for the ParaTec's state law claims is not, in our view, the equivalent of finding that plaintiffs' antitrust claims and ParaTec's state claims are derived from a common nucleus of operative facts. Indeed, the operative facts giving rise to plaintiffs' antitrust claims necessarily revolve around defendants' opportunity and motive to conspire to fix NBR prices, the relevant market, the effect of defendants' actions upon the competitive market conditions and the injury to plaintiffs.  See Santana Products, Inc. v. Bobrick Washroom Equipment, Inc., 69 F. Supp. 2d 678, 688 (M.D. Pa. 1999); Avins v. Hannum, 497 F. Supp. 930, 946 (E.D. Pa. 1980).  The operative facts giving rise to ParaTec's cross-claims, on the other hand, appear to be whether ParaTec and Crompton entered into a subsequent agreement regarding immunity, whether Crompton breached that agreement by failing to secure immunity for ParaTec, and what, if any, damages ParaTec suffered

28

as a consequence all of which appear unrelated to NBR price-fixing.

    In this manner, ParaTec's reliance on Nanavati v. Burdette Tomlin Memorial Hospital, 857 F.2d 96 (3d Cir. 1998), for the proposition that there only needs to be some critical background facts in common to justify supplemental jurisdiction, appears to be misplaced.  In that case, the plaintiff, Dr. Nanavati, brought antitrust, discrimination and slander claims against the defendant hospital and another doctor, Dr. Sorensen.  Dr. Sorensen, in turn, brought several counterclaims against Nanavati, including one for slander, which Nanavati argued was not properly connected to any federal claim and that the district court, therefore, lacked jurisdiction over it.  Rejecting Nanavati's position, the Court of Appeals for the Third Circuit, noting that the enmity between the two physician was a critical background fact common to all claims, found that the slander claim would become part of the antitrust suit anyway since Sorensen could use Nanavati's alleged wrongful behavior to justify his (Sorensen's) own actions which Nanavati alleged was violative of the antitrust laws.  Id. at 105-06.  Thus, although the Court of Appeals allowed that the enmity between the two doctors was a critical background fact, its decision that jurisdiction was proper rested on the fact that the facts surrounding the slander claims would be relevant to and likely presented in the antitrust case.

Here, unlike in <u>Nanavati</u>, it does not appear that the facts surrounding ParaTec's breach of contract claim are at all relevant to plaintiffs' antitrust litigation.  Nor does it appear that the inverse is true as the facts pertinent to plaintiffs' alleged antitrust violation are not facts which would arise in ParaTec's breach of contract case.  The fact that Crompton and ParaTec would not have entered into the alleged oral agreement to seek immunity had the antitrust suit not been brought, does not alter that fact or suggest that plaintiffs' federal claims and ParaTec's breach of contract claims are derived from a common nucleus of operative facts.  See <u>Lyon v. Whisman</u>, 45 F.3d 758 (3d Cir. 1995)(Finding no supplemental jurisdiction where the plaintiff's federal claim brought under the Fair Labor Standards Act alleging that her employer failed to pay overtime wages was factually distinct from her state law claim the her employer failed to pay her a promised overtime bonus despite the common employer-employee relationship.); <u>Obendorfer v. Gitano Group, Inc.</u>, 838 F. Supp. 950, (D.N.J. 1993) (Finding that husband's defamation claim and wife's sexual harassment and sex discrimination suit brought against her supervisor were not so related as to form part of the same case and controversy since different facts and law were at issue.)  See also <u>Bradley v. North Carolina Department of Transportation, DMV</u>, 286 F. Supp. 2d 697, 705-06 (W.D.N.C. 2003) (Finding that "mere 'but for'

causation is not a close enough relationship between state and federal claims to give federal court jurisdiction.")  It therefore appears that supplemental jurisdiction is lacking over ParaTec's claims brought at Counts IV, V, VI and VII and Crompton's motion in this regard is properly granted.

For these reasons, it is recommended that the motion to dismiss ParaTec's cross-claims (Docket No. 104-1) submitted on behalf of defendants Crompton Corporation and Uniroyal Chemical Company, Inc. be granted as to Counts IV, V, VI and VII and denied in all other respects, and that the motion to compel arbitration (Docket No. 104-2) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

Dated:  August 15, 2005